**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| MARIA SHANNA BASS, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO.____________ |
| | § | |
| v. | § | |
| | § | |
| FEDERAL NATIONAL MORTGAGE | § | |
| ASSOCIATION d/b/a FANNIE MAE, | § | JURY TRIAL DEMANDED |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Maria Shanna Bass files this Original Complaint against Defendant Federal National Mortgage Association d/b/a Fannie Mae, and states as follows:

## I. PARTIES

1. Plaintiff Maria Shanna Bass is an individual residing in Denton County, Texas. She is a former employee of Fannie Mae who worked out of Fannie Mae's Plano, Texas office, located in Collin County, Texas.

2. Defendant Federal National Mortgage Association is a federally chartered, privately owned, for-profit corporation doing business as Fannie Mae. Its principal office is located at 1100 15th Street NW, Washington, D.C. 20005. At all relevant times, Fannie Mae maintained a business office in this District at Granite Park VII, 5600 Granite Parkway, Plano, Texas 75024, where Ms. Bass worked. Fannie Mae employs more than 500 employees. Fannie Mae may be served through its registered agent, Corporation Service Company (CSC), 251 Little Falls Drive, Wilmington, Delaware 19808.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. This Court has supplemental jurisdiction over Plaintiff's related state law claims under the Texas Commission on Human Rights Act, Tex. Lab. Code § 21.001 et seq., pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the Sherman Division of the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because all or a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in or around Collin County, Texas, and because Ms. Bass would have continued to work in this District and Division but for the unlawful conduct alleged herein.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. On March 3, 2026, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission, Civil Rights Division, designated EEOC Charge No. 450-2026-05575, alleging disability discrimination, age discrimination, retaliation, and related unlawful employment practices arising from the events described herein.

6. Plaintiff has satisfied all administrative prerequisites to suit. Plaintiff's FMLA claims require no exhaustion of administrative remedies. Plaintiff received a Notice of Right to Sue from the EEOC dated September 1, 2026, and files this action within ninety days of her receipt of that notice.

## IV. FACTS:

### A. Ms. Bass's 17.5-Year Career at Fannie Mae

7. Maria Shanna Bass was born on September 4, 1979. She began working for Fannie Mae on July 14, 2008, as a Business Operations Representative in the NPDC Asset Collections Department.

8. Over the course of approximately 17.5 years, she earned multiple promotions and advanced through increasingly responsible roles, including REO Foreclosure III in April 2011, Business Analyst II in November 2012, Project Analyst III in 2015, Associate, and Senior Associate in 2021, including at least two Promotions in Place. Ms. Bass also served as President of the Dallas/Plano chapter of Fannie Mae's Asian Employee Resource Group, where she hosted cultural, professional-development, and cross-collaboration events, and co-hosted a Business Showcase event with more than 500 attendees that was recognized by executive leadership and featured on Fannie Mae's internal home page.

9. At the time of her termination, Ms. Bass held the title of Senior Business Intelligence Associate in the Single-Family Operational Risk department.

10. In that role, she developed dashboards and applications, prepared executive reporting, managed and developed RCSA and Trigger metrics, served as the point of contact for data migration, streamlined processes, served as a lead developer and point of contact for reporting and application development, and mentored junior associates.

11. Ms. Bass had a long record of successful performance at Fannie Mae. She received consistently positive performance reviews, multiple promotions, sustained merit increases, and contribution awards of $7,210 for 2022, $8,800 for 2023, and $4,740 for 2024. She received the highest available Results rating, "1 – Exceeded Expectations," in 2020, 2022,

and 2023, a rating that Fannie Mae awards to only a limited percentage of employees within a department and that requires approval by the department Vice President. Before late 2025, Ms. Bass had never received a negative performance assessment, written warning, or formal discipline during her 17.5-year career at Fannie Mae.

12. Effective February 9, 2025, Ms. Bass received a 3% merit increase, bringing her annual base salary to $117,640. On February 21, 2025, she received her 2024 contribution award of $4,740.

**B. Ms. Bass's Disability**

13. Ms. Bass has a physical disability that she has lived with her entire life. During childbirth, she sustained a left brachial plexus injury that severed the nerves in her left arm and substantially limited the function of that arm.

14. Because Ms. Bass cannot use her left arm, she relies on her right hand alone for activities of daily living and work tasks. She cannot use standard over-the-ear headsets that require two hands to place and remove. She requires an earbud-style device that she can manage with her right hand alone.

**C. Oct. 2024: Ryan Adascheck Becomes Ms. Bass's Manager**

15. In or around September and October 2024, Fannie Mae reorganized the SFOR department, eliminating approximately 40% of its employees. The majority of those eliminated were over the age of 40. In the same reorganization, three of SFOR's four risk managers, each of whom was a woman of minority status over the age of 40, were demoted to Advisor roles, while the only risk manager who retained his position was a white male.

16. Ryan Adascheck became Director of the SFOR Business Intelligence division after transitioning into SFOR from another division.

17. Ms. Bass became his direct report on or about November 3, 2024.

18. When Adascheck assumed management of the team, he had no prior history managing Ms. Bass and was new to the team and its workflows. Following the reorganization, Ms. Bass's workload increased significantly: she inherited recurring reports previously handled by her former manager,including the Metrics Report and the Data Quality Report, as well as the Performance Report initiative previously led by a former team lead.

19. In his 2024 year-end performance review of Ms. Bass, Adascheck rated her as meeting expectations on both behaviors and results. He wrote that "Shanna Bass has long been an integral part of our Reporting team," that she had "demonstrated a strong work ethic, technical proficiency, and a steady commitment," and that she "handled the transition with professionalism and resilience."

20. Kayla Lafferty was hired by Fannie Mae in or around early 2024 and began work as a Campus Associate in the summer of 2024, after completing her graduate studies. Ms. Bass was assigned as Lafferty's start partner and was responsible for training her, including through weekly check-ins and instruction on PowerApps development.

**D. <u>Early 2025: Fannie Mae Praises Ms. Bass's Work Before Her Leave</u>**

21. In February and March 2025, Adascheck assigned Ms. Bass to multiple active workstreams, including Reporting Insights Procedures, a Data Accessibility Review, and Requirements Templates, while she continued carrying responsibility for executive reporting and operational metrics.

22. On March 7, 2025, Joel Campagna, a Director in SFOR, confirmed in writing: "I confirm the accuracy and completeness of all metric values within the production environment related to the SFOR Metrics Reports." This included Ms. Bass' work. On March 11, 2025, after

meeting with Ms. Bass to validate the MSI Ratio, Data Quality, Records Inventory, and Operational Risk Events metrics in the SFOR Performance Metrics report, Campagna again confirmed in writing: "Confirming that the numbers looked accurate when we validated them." Team lead John Phillips was copied on that confirmation.

23. On April 1, 2025, Adascheck awarded Ms. Bass 2,500 recognition points through Fannie Mae's internal BEAT Award platform, thanking her for her efforts in helping SRRI achieve the M3 milestone for the Data Quality MSI, and stating that her work would "help set the foundations for how we deliver quality risk management based analytics for SFOR and our Single Family Business partners."

24. On April 3, 2025, Adascheck confirmed in writing: "I confirm the accuracy and completeness of the MP SFOR Data Quality Business Requirements Document V1.0 Business Requirements Documentation." This was the same Business Requirements Documentation Adascheck would later characterize as deficient, after Ms. Bass took protected medical leave.

25. On April 7, 2025, during a coaching and feedback meeting, Adascheck instructed Ms. Bass to stop working on documentation and prioritize execution of recurring reports, telling her: "Let's pause on the documentation piece," and "we're gonna hit the pause on the requirements, on all of that stuff."

26. That same day, Ms. Bass sent Adascheck a confirmation email memorializing his instruction: "Per our conversation, I will reprioritize the on completion of the remaining BRD in order to execute my reoccurring reports." Adascheck did not dispute, correct, or contradict this written summary.

27. On April 11, 2025, Adascheck sent a team-wide email with the subject line "Q2 Inventory Update," in which he specifically directed that Ms. Bass's performance report

automation project be cancelled: "For the performance report automation JIRA ticket - we can cancel this feature as we will be revamping some of this as part of a broader SFOR objective."

28. In that same April 11 email, Adascheck redistributed team inventory and assigned the RAMP Tool to Kayla Lafferty, a younger team member, as primary owner, rather than to Ms. Bass. Fannie Mae's own access records were consistent: on March 25, 2025, Lafferty circulated an EUC asset-access spreadsheet to the SFOR Risk Manager, copying Adascheck, listing Adascheck as Owner of the RAMP Tool, Phillips and Lafferty as Co-Owners, and Ms. Bass as only a User.

**E. <u>April 2025: Ms. Bass Takes Approved FMLA and Disability Leave</u>**

29. On April 17, 2025, Ms. Bass began approved Family and Medical Leave, administered by Fannie Mae's third-party leave administrator, Sedgwick Claims Management Services, Inc. Her FMLA leave was approved from April 17, 2025 through July 16, 2025.

30. The leave was based on complications from her brachial plexus injury and severe carpal tunnel syndrome in her right hand, which impaired her ability to perform manual tasks.

31. Ms. Bass had no access to her Fannie Mae work email during her leave. She was medically unable to work, was following her physician's directions, and was in no position to monitor ongoing work product or respond to any alleged issue that arose during her absence.

32. During Ms. Bass's leave, Adascheck conducted a Quarterly Procedure QC audit of the team's work. The audit was announced by an email dated May 13, 2025, sent to the team, including Ms. Bass's inaccessible work email.

33. Ms. Bass had no opportunity to see the audit, respond to it, or explain any findings, because she was out on leave.

34. When Ms. Bass's twelve weeks of FMLA entitlement expired, Fannie Mae extended her leave through October 15, 2025, as an accommodation for her disability.

35. While Ms. Bass was on leave, in August 2025, Adascheck promoted Kayla Lafferty, the younger employee Ms. Bass had trained, from Campus Associate to Associate.

36. Lafferty had been employed at Fannie Mae for approximately one year at the time of this promotion.

**F. <u>October 8th: Adascheck Tries to Fire Bass While She's on Leave.</u>**

37. Fannie Mae's own EEOC Position Statement admits that Adascheck initiated an HR intake on October 8, 2025. Two days later, on October 10, 2025, Adascheck met with HR, accused Bass of having performance problems, and expressed his belief that Ms. Bass's employment should be terminated.

**G. <u>October 2025: Bass is Met With Hostility When She Returns from Leave.</u>**

38. Ms. Bass returned to work on October 27, 2025.

39. On her first day back, the team was set to go to lunch together. Adascheck, seated next to Ms. Bass, stood up, walked over to Kayla Lafferty to confirm that Lafferty was going, and then the team then left without Ms. Bass. A coworker who witnessed the exclusion noticed it and asked Ms. Bass why she had not been invited.

40. Adascheck imposed a different in-office schedule on Ms. Bass. When she arrived at a time other than 8:30 a.m., she was told that business office hours were 8:30 to 5:00 and was provided a link to the employee handbook, even though other team members kept varying schedules and were not given reminders like this. Fannie Mae's own Business Hours policy states that general business hours are 8:30 a.m. to 5:00 p.m. *Eastern*, that schedules "may vary depending on business needs," and that actual start times depend on factors including an

employee's work location and time zone. Ms. Bass was a salaried employee who routinely worked outside normal business hours, including late evenings and early mornings, to deliver projects.

41. After her return through mid-December 2025, Adascheck refused to speak to Ms. Bass directly, even when both were physically present in the office together.

42. Team lead John Phillips also treated Ms. Bass in a condescending and aggressive manner in group settings. On one occasion he responded to her question with: "There are a hundred ways to do this. This is not the time for solutions. You're gonna have to Google it." A coworker who overheard Phillips's treatment texted Ms. Bass: "Hey, Shanna, try to keep it together. The way he is speaking to you all is unacceptable."

**H. <u>October 30th: Ms. Bass Requests a Disability Accommodation</u>**

43. On October 30, 2025, Ms. Bass submitted a purchase requisition through Fannie Mae's ProcureOne system for a Shokz OpenFit wireless earbud headset from CDW Direct LLC, at a total cost of $168.85.

44. Ms. Bass needed an earbud-style device because her non-functional left arm prevents her from using standard over-the-ear headsets.

45. The request was routed to Adascheck. That afternoon, he emailed Ms. Bass: "Hi Shanna, Can I get some context for this request?" Ms. Bass replied that it was a headset she did not have. Adascheck asked whether she had lost or broken a prior headset; Ms. Bass replied that she had never had a headset and had used her phone to call into meetings.

46. On October 31, 2025, at 4:53 a.m., Adascheck denied the request, writing: "Understood. You will notice I did have to reject this request this morning. The standard issue

headsets is currently the EPOS Impact 860T. Given current budget constraints across the organization can you please re-submit with this selection?"

47. Later that morning, Ms. Bass replied: "I'll talk to you about this Monday, but for ADA reasons, I can't get the recommended headset."

48. On November 5, 2025, Adascheck sent a follow-up email about the accommodation process, providing a link to a form and stating: "I believe you can mail this to [ADA Request@fanniemae.com](mailto:ADA_Request@fanniemae.com)."

49. On November 20, 2025, Ms. Bass met with Blake Fitch and formally submitted her ADA paperwork, including a written certification from her doctor.

## I. <u>November 5th: Adascheck Accuses Bass of Being "Off-Track."</u>

50. On November 5, 2025, just nine days after Ms. Bass returned from approved leave, Adascheck sent her an email with the subject line "RE: Monthly Coaching and Feedback - Bass." It was the first negative performance assessment of her 17.5-year career.

51. The email stated that Ms. Bass's "current performance is trending off-track for the year" and identified four categories of purported gaps: Documentation and Standard Work Deficiencies; Data Quality and Reporting Accuracy; Manual Processes and Lack of Automation; and Communication and Ownership Gaps.

52. Each category was grounded in work Adascheck reviewed during Ms. Bass's leave, including work he had told her to pause, work he had approved in writing, and automation he had personally cancelled.

53. During the November 5 coaching meeting, when Ms. Bass asked for specific examples of the alleged deficiencies, Adascheck said he would need to "go back and get the specifics because it's been five months." When Ms. Bass reminded him that he had told her in

April to pause documentation work, he brushed it off and told her they needed to focus on moving forward.

### J. <u>December 17th: Bass's Protected Report to Amy Hynds.</u>

54. On December 17, 2025, Ms. Bass met by video conference with Amy Hynds, the Vice President of SFOR and Adascheck's direct supervisor. The meeting lasted approximately one hour.

55. Ms. Bass explained, in detail, her exclusion from the first-day-back team lunch; the disparate office-hours requirement; Adascheck's prolonged refusal to speak to her; the condescending treatment from John Phillips; and her belief that she was being punished for taking medical leave.

56. Ms. Bass also described her physical disability to Hynds in detail, explaining that the brachial plexus injury had "severed the nerves in my left arm," leaving her "only having the ability to use my right hand."

57. Hynds acknowledged the seriousness of Ms. Bass's complaint, telling her: "you should not feel like you're coming back and being punished for being on leave. That is a legal, legitimate reason to be on leave." Hynds added: "I want to make sure we take appropriate steps," and "I'll talk with our HR consultants."

58. After the December 17 meeting, however, no HR representative ever contacted Ms. Bass to request her supporting documents, interview her, or follow up with her - allowing her to be fired just 26 days later.

### K. <u>Fannie Mae Ignores Its Own Policies</u>

59. Fannie Mae's EEO Non-Discrimination Guideline required People Managers, Officers, and HR representatives to know and help enforce the company's guidelines. If they

received information indicating a possible violation, they were required to report it to FM Ethics, and People Managers and Officers could also report to HR, which was required to report to FM Ethics.

60. The same guideline stated that employees must always have a viable means to report violations, that employees will not be retaliated against for reporting violations, and that People Managers, Officers, and HR representatives must foster a culture where employees are encouraged to raise compliance and ethics concerns without fear of retaliation.

61. Fannie Mae's Code of Conduct stated that Fannie Mae takes compliance and ethics concerns seriously, reviews them promptly, documents them promptly, does not tolerate retaliation, and uses an objective investigation process when FM Ethics determines an investigation is appropriate.

62. The Code of Conduct identified retaliation and failure to raise suspected Code or legal violations as Code-breaking conduct and provided for investigation and discipline when misconduct occurs.

63. Fannie Mae failed to follow these policies in multiple concrete ways. After Ms. Bass complained to Hynds on December 17, Fannie Mae did not interview Ms. Bass, did not request her documents, did not pause the termination process, did not remove Adascheck from the decision-making process, and did not require an independent review before termination. Upon information and belief, Fannie Mae also did not route the complaint to FM Ethics, did not open an objective investigation, did not document any meaningful investigation, and did not interview Adascheck about the contradictions Ms. Bass identified.

**L. December 18th: Adascheck Finalizes the Termination.**

64. At 9:13 p.m. on December 18, 2025, the next evening after Ms. Bass complained to Hynds, Adascheck sent her an expanded negative performance email, again titled "RE: Monthly Coaching and Feedback - Bass," identifying three more areas of purported gaps: engagement and collaboration; reliability and professionalism; and technical accuracy and documentation.

65. That same day, Adascheck finalized and signed the "Justification for Termination" document for Ms. Bass.

66. The December 18 termination justification identified Adascheck as the author, copied Hynds, and stated: "I have made the decision to terminate her employment with Fannie Mae."

67. A reasonable employer acting in good faith would have stopped the termination process, knowing that Ms. Bass had *just* accused the firing manager of retaliation.

**M. Adascheck's Allegations Were False and Unworthy of Credence**

68. Adascheck's accusations of poor performance were false, unworthy of credence, and contradicted by the company's own documents.

69. The documentation/standard-work allegation is materially misleading and unworthy of credence. Adascheck lumped together Standard Work documents, Requirements Documents, manual-step documentation, and report-specific documentation. But the BRD/requirements work had been paused at Adascheck's direction on April 7 so Ms. Bass could focus on recurring report execution; the Data Quality BRD had already been approved by Adascheck as accurate and complete on April 3; and the status of the remaining standard work was known to and accepted by Adascheck before Ms. Bass's leave. Adascheck's own April 11,

2025 inventory tracked which standard work documents were completed, in progress, or not yet started, and reassigned those reports to new owners. As to the Quarterly Operational Risk Report, prior standard work existed, and its update was deferred because the report was being revamped through a working group, in which Adascheck and Phillips also participated, before changes were finalized. Fannie Mae cannot fairly recast documentation that its own manager tracked, deprioritized, and reassigned as Ms. Bass's individual failure.

70. The allegation that Ms. Bass's Business Requirements Documentation was deficient is unworthy of credence. Adascheck had previously approved the Data Quality Business Requirements Documentation in writing on April 3, 2025, confirming its "accuracy and completeness."

71. Adascheck personally created and presented the roadmap ("SRRI Strategy & Goal Setting," February 2025). Notably, the Key Indicator Dashboard Automation/Enhancement initiative, owned by Lafferty, was not identified as its own milestone or included within the SFOR Report Automation milestone, and the milestone calling for a deep-dive review of the existing RAMP tool framework was assigned to Thomas Chedru and Lafferty, not Ms. Bass.

72. The allegation that Ms. Bass failed to own or proactively address RAMP Tool issues is unworthy of credence. Adascheck's own April 11 inventory redistribution assigned the RAMP Tool to Kayla Lafferty, not to Ms. Bass, and Fannie Mae's March 25, 2025 access records listed Adascheck as the RAMP Tool's Owner and Ms. Bass as only a User.

73. The source material for the Data Quality findings, Fannie Mae's enterprise Issue Data Quality and Compliance review, was distributed on April 1, 2025 to Adascheck, Hynds, and other SFOR leaders. On April 7, 2025, Director Campagna informed Ms. Bass and Adascheck

that he had resolved the cited Data Quality finding with the review owner and asked that it not be counted.

74. The allegation that Ms. Bass relied improperly on manual processes is unworthy of credence because the automation projects identified by Adascheck were either scheduled during or after Ms. Bass's protected leave, or were affirmatively cancelled by Adascheck himself. The performance report automation project due before leave was the project Adascheck cancelled on April 11, 2025. Moreover, manually created reports remained a standard, team-wide practice after Ms. Bass returned. On October 24, 2025, team lead John Phillips announced an inventory realignment to the entire team, copying Adascheck, identifying as one of his goals to "distribute manually created Excel reports" among team members.

75. The allegation that Ms. Bass misrepresented the status of her work is false. When Ms. Bass asked Adascheck for specific examples of this during the November 5 coaching meeting, he could not provide any and said he would need to "go back and get the specifics because it's been five months."

76. The allegation that Ms. Bass failed to improve after clear feedback is false. Adascheck had already initiated the termination process before Ms. Bass ever returned to work or received any such feedback. And after she returned, the only feedback she received was vague and generalized - not "clear." She asked for examples, but Adascheck could not provide any. She was never given a PIP or other clear directive.

77. The allegation that Ms. Bass lacked engagement and collaboration is unworthy of credence. After her return, Adascheck largely refused to speak to her directly, and excluded her from normal team interactions. He isolated Ms. Bass and then blamed her for the resulting lack of collaboration.

78. The allegation that Ms. Bass acted unprofessionally by rescheduling a December 10 one-on-one meeting is false. Adascheck had himself previously rescheduled the same recurring meeting, and his own written calendar invitation expressly authorized Ms. Bass to reschedule to the following week, which is precisely what she did.

79. The allegation that Ms. Bass was unreliable because of meeting participation or ordinary work scheduling is unworthy of credence. Other team members kept varying schedules, but Ms. Bass was the only one singled out and held to a strict 8:30 a.m. to 5:00 p.m. requirement after returning from leave.

80. The allegation that Ms. Bass failed on the RCSA project is unworthy of credence. Ms. Bass was assigned approximately 26 metrics, while a Washington, D.C. counterpart was assigned approximately 6 metrics for the same project, and the counterpart received an extension rather than discipline when he struggled. The RCSA work had originally been assigned to John Phillips, who had begun working on it, before it was reassigned to Ms. Bass despite her concern, raised at the outset, that she had limited RCSA experience. Throughout the project, the business partners repeatedly changed the metric definitions and calculations Ms. Bass was required to build.

81. Fannie Mae either knew, or should have known (and certainly would have known if it followed its own policies and conducted an investigation into Ms. Bass's complaints of unlawful conduct) that Adascheck's justifications for termination were false and unworthy of credence.

**N. <u>January 12th: Termination Communicated to Ms. Bass.</u>**

82. On January 12, 2026, Adascheck and Erin Tyms, a Fannie Mae HR representative from employee relations, conducted a termination call with Ms. Bass by Microsoft Teams.

83. Adascheck stated: "over time, we have been discussing that your performance has not met standards or expectations. The decision has been made to terminate your employment from Fannie Mae effective today, Monday, January 12th, 2026."

84. When Ms. Bass asked about the circumstances of the decision, Tyms told her: "this meeting really isn't to go into details, It's really just to let you know that the decision has been made. So unfortunately, we're not gonna be answering any additional questions."

85. The Separation Option Agreement issued to Ms. Bass that day was signed on behalf of Fannie Mae by Cheryl Sember, Vice President of Human Resources Operations.

86. No Performance Improvement Plan was ever issued to Ms. Bass before her termination, and she had no prior written discipline or formal performance warning in her 17.5 years at Fannie Mae.

**O. Bass's Job is Filled by a Substantially Younger Replacement.**

87. Kayla Lafferty joined Fannie Mae as a Campus Associate in the summer of 2024 and is significantly younger than Ms. Bass, who trained her.

88. Under Adascheck's supervision, Lafferty received two in-place promotions in fewer than six months. Adascheck promoted Lafferty from Campus Associate to Associate in August 2025, while Ms. Bass was on leave, and nominated her for a second promotion during the November 10 to 21, 2025 nomination window, while Ms. Bass was still employed and while Fannie Mae was building its termination case against her. Upon information and belief, there was no open requisition or business plan for an additional Senior Business Intelligence Associate on the team at that time, meaning the promotion contemplated Lafferty filling Ms. Bass's position.

89. On or about February 5, 2026, approximately 24 days after Ms. Bass was terminated, Adascheck announced by department-wide email that Lafferty had been promoted to

Senior Business Intelligence Associate, effective immediately. Senior Business Intelligence Associate was Ms. Bass's exact former title.

**P. <u>The Harm to Ms. Bass.</u>**

90. As a result of her termination, Ms. Bass lost her base salary of $117,640 per year (approximately $9,803 per month), together with the 2025 Short-Term Incentive award she would have received in early 2026 (historically approximately 5% of base salary - $7,210, $8,800, and $4,740 in 2022, 2023, and 2024, respectively). Ms. Bass also lost the annual merit increases she would have continued to receive, having received a 3% merit increase as recently as February 2025.

91. Ms. Bass also lost employer-sponsored health, dental, and vision insurance, 401(k) employer contributions, and other employment benefits. She could not afford to enroll in COBRA and has been forced to rely on government assistance.

92. Because her termination was characterized as being for cause based on performance, her ability to secure new employment has been impaired. She has not found comparable employment despite actively searching through networking and online job listings.

## V. CAUSES OF ACTION

COUNT ONE:
<u>FMLA RETALIATION ( 29 U.S.C. § 2615(a)(2))</u>

93. Plaintiff incorporates all preceding paragraphs.

94. Ms. Bass engaged in activity protected by the FMLA by taking approved FMLA leave from April 17, 2025 through July 16, 2025, extended through October 15, 2025.

95. Fannie Mae retaliated against Ms. Bass when it, through its employees acting in a managerial capacity, fired her because she had needed and taken FMLA leave.

96. Fannie Mae's stated performance reasons are false and unworthy of credence for the reasons set forth above. That matters because an employer's false explanation is not a collateral issue; it is circumstantial evidence of unlawful intent. As the Supreme Court explained, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In appropriate circumstances, a factfinder may infer from the falsity of the employer's explanation that the employer is "dissembling to cover up a discriminatory purpose." *Id*

97. A reasonable employer would have known that building a termination case during protected leave, relying on work reviewed during protected leave, and terminating an employee shortly after return from medical leave presented a substantial risk of violating the FMLA.

98. Plaintiff seeks all remedies available under the FMLA, including lost wages, salary, employment benefits, other compensation, other actual monetary losses, interest, liquidated damages, equitable relief, reinstatement or front pay in lieu of reinstatement, attorney's fees, and costs.

## COUNT TWO:
## ADA/TCHRA DISABILITY DISCRIMINATION
## (42 U.S.C. § 12112(a); TEX. LAB. CODE §§ 21.051, 21.052)

99. Plaintiff incorporates all preceding paragraphs.

100. Ms. Bass has a disability within the meaning of the ADA and TCHRA: a left brachial plexus injury sustained at birth that substantially limits the use of her left arm, the operation of her musculoskeletal and neurological functions, and the performance of manual tasks and activities of daily living, further complicated by carpal tunnel syndrome in her right hand.

101. Ms. Bass was qualified to perform the essential functions of her Senior Business Intelligence Associate position, with or without reasonable accommodation, and had done so successfully for approximately 17.5 years, earning consistently positive reviews, multiple promotions, and sustained merit increases.

102. Fannie Mae knew of Ms. Bass's disability through multiple channels, including its administration of her disability-related leave through Sedgwick, her explicit invocation of "ADA reasons" to Adascheck on October 31, 2025, her formal ADA paperwork and physician certification to Blake Fitch on November 20, 2025, and her detailed description of her disability to VP Hynds on December 17, 2025.

103. Fannie Mae fired Ms. Bass because of her disability, or because she was regarded as being disabled, or because she had a record of being disabled. Fannie Mae knew Ms. Bass had just returned from disability-related leave, knew HR was working with her on an ADA accommodation, and knew she had complained to Hynds that she was being punished after leave and denied accommodation. Fannie Mae nevertheless allowed the same manager involved in the denied accommodation and the complained-of conduct to finalize the termination.

104. Fannie Mae's stated performance reasons are false and unworthy of credence for the reasons pleaded above. That matters because an employer's false explanation is not a collateral issue; it is circumstantial evidence of unlawful intent. As the Supreme Court explained, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In appropriate circumstances, a factfinder may infer from the falsity of the employer's explanation that the employer is "dissembling to cover up a discriminatory purpose." *Id*

105. Fannie Mae acted with reckless indifference to Ms. Bass's federally protected ADA rights and, under Texas law, with gross negligence.

106. Adascheck initiated HR intake on October 8, 2025, met with HR on October 10, stated his belief that Ms. Bass should be terminated, and began drafting the termination justification before Ms. Bass returned to work. By October 15, HR had also told Adascheck that Blake Fitch was working with Ms. Bass on an ADA accommodation. A reasonable, not reckless employer would have paused termination planning, reviewed the leave and accommodation timeline, and separated the accommodation process from any termination process.

107. A reasonable, not reckless employer would have investigated an employee's complaint of retaliation by her supervisor, before allowing that supervisor to terminate that employee.

108. A reasonable, not reckless employer would have applied and enforced its own reporting and investigation policies after Ms. Bass complained of unlawful behavior by her supervisor, including prompt review, prompt documentation, ensuring non-retaliation, conducting an objective investigation including an interview, and a request for documents, removing Adascheck from the process, and pausing termination efforts until a full investigation could be completed.

109. These acts and omissions show more than poor judgment. They show that Fannie Mae knew or should have known there was an extreme risk that Ms. Bass was being terminated because of disability and disability-related protected activity, yet proceeded with conscious indifference to that risk.

110. Plaintiff seeks all remedies available under the ADA and TCHRA, including back pay, front pay or reinstatement, compensatory damages, punitive damages under the ADA,

exemplary damages under the TCHRA, attorney's fees, costs, interest, and all other relief allowed by law.

COUNT THREE:
ADA RETALIATION FOR REQUESTING ACCOMMODATION (42 U.S.C. § 12203(a))

111. Plaintiff incorporates all preceding paragraphs.

112. Ms. Bass engaged in ADA-protected activity by requesting a disability accommodation.

113. On October 30, 2025, Ms. Bass requested the Shokz OpenFit wireless earbud headset because she needed a device she could use with her only functioning hand. On October 31, 2025, she expressly told Adascheck: "I'll talk to you about this Monday, but for ADA reasons, I can't get the recommended headset."

114. On November 20, 2025, Ms. Bass met with Blake Fitch and formally submitted ADA paperwork and physician certification.

115. Fannie Mae retaliated against Ms. Bass by firing her for requesting accommodations. Although Adascheck had initiated HR intake before Ms. Bass's October 30 and October 31 accommodation request, Fannie Mae did not terminate her until after the accommodation request. It escalated the paper record, issued the November 5 off-track assessment, failed to implement the accommodation, allowed the December 18 termination justification to be finalized, and terminated her employment, all after the accommodation request.

116. Fannie Mae's stated performance reasons are false and unworthy of credence for the reasons pleaded above. That matters because an employer's false explanation is not a collateral issue; it is circumstantial evidence of unlawful intent. As the Supreme Court explained, "Proof that the defendant's explanation is unworthy of credence is simply one form of

circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In appropriate circumstances, a factfinder may infer from the falsity of the employer's explanation that the employer is "dissembling to cover up a discriminatory purpose." *Id*

117. Fannie Mae acted with reckless indifference to Ms. Bass's federally protected ADA rights. The company knew Ms. Bass had requested an ADA accommodation. The company knew that Ms. Bass had reported what she perceived a failure on the part of her manager to work with her on that accommodation, and reported information suggesting possible discrimination based on that accommodation request. Yet Fannie Mae failed to remove Adascheck from the termination process; failed to firewall the accommodation process from the termination process; and allowed termination to proceed before the approved accommodation was ever provided.

118. Plaintiff seeks all remedies available under the ADA, including back pay, front pay or reinstatement, compensatory damages, punitive damages, attorney's fees, costs, interest, and all other relief allowed by law.

## COUNT FOUR:
## RETALIATION FOR COMPLAINING OF DISCRIMINATION AND RETALIATION (42 U.S.C. § 12203(a); TEX. LAB. CODE § 21.055)

119. Plaintiff incorporates all preceding paragraphs.

120. Ms. Bass engaged in protected activity under the ADA and TCHRA when she complained to VP Hynds on December 17, 2025 that she was being punished for her need for medical leave, treated differently because of her disability, and denied accommodations.

121. Ms. Bass specifically complained to Hynds about the denied ADA headset accommodation, the treatment she experienced after returning from leave, the first negative

assessment in 17 years, Adascheck's refusal to speak with her, disparate office-hour requirements, and her belief that she was being punished for taking leave.

122. Hynds acknowledged the protected nature of the concern, telling Ms. Bass: "you should not feel like you're coming back and being punished for being on leave. That is a legal, legitimate reason to be on leave."

123. Fannie Mae, acting through Ryan Adascheck, retaliated against Ms. Bass for this protected complaint.

124. Fannie Mae's stated reasons are false and unworthy of credence for the reasons pleaded above. That matters because an employer's false explanation is not a collateral issue; it is circumstantial evidence of unlawful intent. As the Supreme Court explained, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In appropriate circumstances, a factfinder may infer from the falsity of the employer's explanation that the employer is "dissembling to cover up a discriminatory purpose." *Id*

125. Fannie Mae acted with reckless indifference to Ms. Bass's federally protected ADA rights and, under Texas law, with gross negligence. Fannie Mae did not ensure compliance with its own written policies requiring non-retaliation, reporting, prompt review, documentation, and objective investigation. Fannie Mae then did not interview Ms. Bass, did not ask for her documents, did not investigate the contradictions in Adascheck's allegations, did not remove Adascheck from the decision-making process, did not pause the termination, and allowed Adascheck to finalize the termination justification the next day after the protected complaint.

126. Those failures demonstrate conscious indifference. A reasonable employer would know that permitting an accused manager to finalize termination paperwork immediately after the employee complained created an extreme risk of unlawful retaliation.

127. Plaintiff seeks all remedies available under the ADA and TCHRA, including back pay, front pay or reinstatement, compensatory damages, punitive damages under the ADA, exemplary damages under the TCHRA, attorney's fees, costs, interest, and all other relief allowed by law.

## COUNT FIVE:
## AGE DISCRIMINATION (29 U.S.C. § 623(a)(1); TEX. LAB. CODE § 21.101)

128. Plaintiff incorporates all preceding paragraphs.

129. Ms. Bass was born in 1979, and was 46 years old when she was terminated on January 12, 2026.

130. Ms. Bass was qualified for her position, which she had performed for years with consistently positive reviews.

131. Fannie Mae terminated Ms. Bass and, within approximately 24 days, promoted Kayla Lafferty, a significantly younger employee, into Ms. Bass's exact former title of Senior Business Intelligence Associate.

132. Ms. Lafferty graduated with her bachelor's degree in 2022, and upon information and belief, was in her twenties at the time of Ms. Bass's termination.

133. Under Adascheck's supervision, Lafferty received two in-place promotions in fewer than six months, including one while Ms. Bass was on leave and one while Fannie Mae was building its termination case against Ms. Bass.

134. The broader pattern also supports an inference of age discrimination: the 2024 SFOR reorganization eliminated approximately 40% of the department, the majority of whom

were over age 40, and three of five risk managers, all over 40, were demoted. A September 2025 organizational chart highlighted five employees, all but one of whom were over 40, prompting an internal Ethics investigation. Upon information and belief, four of those five employees, all women over 40, subsequently lost their jobs with Fannie Mae.

135. Fannie Mae's stated performance reasons are false and unworthy of credence for the reasons pleaded above. That matters because an employer's false explanation is not a collateral issue; it is circumstantial evidence of unlawful intent. As the Supreme Court explained, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In appropriate circumstances, a factfinder may infer from the falsity of the employer's explanation that the employer is "dissembling to cover up a discriminatory purpose." *Id*

136. Ms. Bass's age was the but-for cause of her termination under the ADEA and a motivating and/or determinative factor under the TCHRA.

137. Fannie Mae knew or showed reckless disregard for whether its conduct was prohibited. Fannie Mae knew Ms. Bass was over 40, knew she had a long successful performance history, was being replaced by a significantly younger employee she had trained, and knew or should have known that the stated performance reasons for termination was false and unworthy of credence.

138. Plaintiff seeks all remedies available under the ADEA and TCHRA, including back pay, front pay or reinstatement, ADEA liquidated damages for willful violation, compensatory damages as available under the TCHRA, exemplary damages under the TCHRA, attorney's fees, costs, interest, and all other relief allowed by law.

## VI. JURY DEMAND

139. Plaintiff demands a trial by jury on all claims.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Maria Shanna Bass requests that Defendant Fannie Mae be cited to appear and answer, and that upon final trial, Plaintiff recover judgment against Defendant as follows:

1. Back pay, lost wages, lost salary, lost bonuses, lost incentive compensation, lost employment benefits, and all other lost compensation;

2. Reinstatement to her former position or, in the alternative, front pay;

3. Compensatory damages, including mental anguish, emotional distress, reputational harm, humiliation, inconvenience, and loss of enjoyment of life;

4. Liquidated damages under the FMLA;

5. Liquidated damages under the ADEA for willful violation;

6. Punitive damages under the ADA based on Fannie Mae's reckless indifference to Ms. Bass's federally protected rights;

7. Exemplary damages under the TCHRA based on Fannie Mae's gross negligence;

8. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

9. Costs of suit, expert fees, and reasonable attorney's fees; and

10. All other relief, at law or in equity, to which Plaintiff may be justly entitled.

*Respectfully submitted,*

TREMAIN ARTAZA PLLC

By: */s/ Ashley E. Tremain*
ASHLEY E. TREMAIN
State Bar No. 24066209
ashley@tremainartaza.com

6060 N. Ctrl. Expwy., Ste. 567
Dallas, Texas 75206
Tel: (469) 573-0271
Fax: (214) 254-4941

**ATTORNEYS FOR PLAINTIFF**
**MARIA SHANNA BASS**